IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-10849
_____


In the Matter Of:  SOUTHMARK CORPORATION

                                        Debtor

--------------------------------------------------

SOUTHMARK CORPORATION

                                        Appellant

v.

CRESCENT HEIGHTS VI, INC;
GRAND CHATEAU REALTY VII, INC

                                        Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:94-CV-60-P)
_____

July 26, 1996

Before REAVLEY, KING, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

     Southmark Corporation appeals the district court's

affirmance of the bankruptcy court's order granting summary

judgment to Crescent Heights VI, Inc. and Gran Chateau Realty

---

     [*]  Pursuant to Local Rule 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in Local Rule
47.5.4.

VII, Inc. on Southmark's adversary claim for avoidance and recovery of an alleged fraudulent transfer. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October 1988, Crescent Heights VI, Inc. and Gran Chateau Realty VII, Inc. (collectively, "Crescent") entered into a purchase and sale agreement with Carriage House Corporation ("CHC"), a wholly owned subsidiary of Southmark Corporation, whereby Crescent agreed to purchase the Carriage House Apartments from CHC for $23.5 million. In December, Crescent executed a promissory note in this amount payable to CHC. The note was secured by, inter alia, a mortgage on the Carriage House Apartments in favor of CHC and an irrevocable letter of credit in the amount of $1.5 million. According to Southmark, in April 1989, Southmark agreed with Crescent to accept approximately $18.25 million as payment in full of the note.

In July 1989, Southmark filed for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101-74.[1] As representative of the bankruptcy estate, Southmark brought the instant adversary proceeding against Crescent, alleging that Crescent received a fraudulent transfer when it made the discounted payoff of the note. Pursuant to 11 U.S.C. § 548(a)(2)(A), Southmark sought to avoid this transfer on the grounds that it received "less than a reasonably equivalent

---

[1] CHC was not itself a debtor in the Chapter 11 proceeding; likewise, Crescent was not a creditor of Southmark in that proceeding.

value" in exchange for the transfer.[2] With respect to its connection to the transfer, Southmark stated in its complaint that CHC was a wholly owned subsidiary of Southmark created to own the Carriage House Apartments and that Southmark's management "exercised full and complete control and dominion over CHC." Southmark attached copies of the purchase and sale agreement, the promissory note, and the mortgage to its complaint as exhibits.

Crescent moved to dismiss Southmark's complaint, or alternatively, for judgment on the pleadings. Specifically, Crescent argued that Southmark's complaint failed to state a claim against Crescent because Southmark had no interest in the note that was the subject of the alleged fraudulent transfer.[3] Rather, Crescent contended that Southmark was improperly attempting to pierce its own corporate veil for its benefit.

Southmark filed a response to this motion along with three supporting affidavits.[4] First, Southmark asserted that it had stated a claim for relief under § 548 of the Bankruptcy Code

---

[2]Southmark asserted a similar claim under § 544, alleging that the transfer was invalid under state law. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(2).

[3]The absence of an interest in the note would be fatal to Southmark's fraudulent transfer claims because the bankruptcy court's avoidance powers extend only to the "transfer of an interest of the debtor in property" or an obligation incurred by the debtor. 11 U.S.C. § 548(a).

[4]The affidavits submitted by Southmark were those of Robert M. Galecke, a former officer of Southmark and CHC, Roger Hooten, a Southmark officer, and Sue Seawell, a business records custodian at First Bank National Association--Minneapolis who authenticated records and statements for an account held by Southmark.

because the allegation that it could recover the transfer placed Crescent on notice that Southmark had an interest in the note; otherwise, Southmark contended that it did not have to plead why or how it had an interest in the note. Alternatively, Southmark noted that, if the court could not resolve the motion to dismiss from reviewing the pleadings, it could convert the motion to dismiss to a motion for summary judgment and consider extraneous material such as affidavits. In this regard, Southmark argued that there were fact issues with respect to several theories under which it could have had an interest in the note, including, inter alia, that CHC had assigned the note to Southmark, that Southmark had controlled the note, and that CHC was Southmark's alter ego. In support of these theories, Southmark referenced the affidavits accompanying its response. These affidavits generally reported that CHC was essentially a paper corporation created by Southmark as an accounting mechanism to track transactions involving the apartment complex, that these transactions, including the transfer, had been recorded on Southmark's ledgers, and that the funds transferred in connection with Crescent's discounted payment of the note were wired to a Southmark account.[5]

After a hearing on Crescent's motion, the bankruptcy court issued its ruling from the bench. First, the court noted that it had considered the affidavits submitted by Southmark and was

---

[5]Crescent filed a reply to this response in which it argued, inter alia, that the bankruptcy court should not treat its motion to dismiss as a motion for summary judgment.

4

therefore analyzing Crescent's motion as a motion for summary judgment. The court then ruled that Crescent was entitled to summary judgment because Southmark could not maintain an avoidance action under § 548. Specifically, the court held that there was no genuine issue of material fact with respect to the various theories under which Southmark claimed an interest in the note. The court noted that it was undisputed that CHC was the party on the note and the mortgage, that CHC released the note and the mortgage, and that CHC was a separate corporate entity during all of the relevant transactions. With respect to Southmark's assignment theory, the court found that there was no summary judgment evidence of a transfer of the note from CHC to Southmark. In regard to the control issue, the court held that Southmark's control of CHC did not change the fact that CHC was a distinct corporate entity and that Southmark could not ignore that distinction. The court pointed out that, although Southmark had possession of the note and recorded the transactions involving the note on its ledgers, there was no endorsement of the note to Southmark or any other evidence of transfer whereby Southmark could claim ownership of the note. Finally, with respect to Southmark's alter ego theory, the court held that Southmark could not pierce its own corporate veil for the purpose of establishing an interest in property whereby it could commence litigation against third parties.

The bankruptcy court later entered a written order granting summary judgment to Crescent for the reasons stated from the

bench.  Southmark timely appealed to the district court, contending that the bankruptcy court erred in holding that there were no genuine issues of material fact with respect to the theories under which it claimed an interest in the note.  The district court affirmed the summary judgment.  Specifically, the court held that there was no evidence of a legitimate transfer of the note from CHC to Southmark, that Southmark's control of the note did not confer an interest in the note, and that Southmark could not pierce its own corporate veil to establish an interest in the note.  Southmark timely appealed.

## II.  STANDARD OF REVIEW

Although the bankruptcy appellate process makes this court the second level of review, we perform the identical task as the district court.  *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1163 (5th Cir.), *cert. denied*, 510 U.S. 992 (1993).  We review findings of fact by the bankruptcy court under the clearly erroneous standard and decide issues of law de novo.  *Henderson v. Belknap (In re Henderson)*, 18 F.3d 1305, 1307 (5th Cir.), *cert. denied,* 115 S. Ct. 573 (1994); *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 434 (5th Cir. 1994).

We review the granting of summary judgment de novo, applying the same criteria used by the bankruptcy court in the first instance.  *Meinecke v. H & R Block*, 66 F.3d 77, 81 (5th Cir. 1995); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir.

6

1994).  First, we consult the applicable law to ascertain the material factual issues.  *Meinecke*, 66 F.3d at 81; *King v. Chide*, 974 F.2d 653, 655-56 (5th Cir. 1992).  We then review the evidence bearing on those issues, viewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Meinecke*, 66 F.3d at 81; *FDIC v. Dawson*, 4 F.3d 1303, 1306 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 2673 (1994).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

Under Rule 56(c), the party moving for summary judgment bears the initial burden of informing the bankruptcy court of the basis for its motion and identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Meinecke*, 66 F.3d at 81.  If the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Meinecke*, 66 F.3d at 81.  The burden on the non-moving party is to do more than simply show that there is some metaphysical doubt as to the material facts.  *Matsushita*, 475 U.S. at 586; *Meinecke*, 66 F.3d at 81.

## III. ANALYSIS

On appeal, Southmark argues that summary judgment was not proper because there are genuine issues of material fact with respect to the three theories under which it claims to have had an interest in the note:  (1) there was an equitable assignment of the note by CHC to Southmark; (2) Southmark controlled the note; and (3) CHC was Southmark's alter ego.  We address each of these arguments in turn.[6]

### A.  Equitable Assignment

Under Texas law,[7] "[n]o particular words or kind of

---

[6]Southmark also urges two other arguments on appeal:  (1) the bankruptcy court erred in failing to give Southmark notice of its intent to convert the motion to dismiss to a motion for summary judgment; and (2) the bankruptcy court impermissibly shifted the burden on summary judgment to Southmark to prove that it had an interest in the note.  Southmark failed to raise these arguments in its initial appeal to the district court. Typically, we will not consider an issue that was not raised below unless the issue involves a pure question of law and our failure to consider it would result in a miscarriage of justice. *Hogue v. United Olympic Life Ins. Co.*, 39 F.3d 98, 102 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 2248 (1995); *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 601 (5th Cir.), *cert. dismissed*, 486 U.S. 1027, *and cert. denied*, 488 U.S. 848 (1988).  While these two issues do involve pure questions of law, Southmark has made no showing or argument as to *why* our failure to consider these arguments under the circumstances of this case would result in a miscarriage of justice.  Such a showing requires more than an assertion that a party might prevail on a issue that it failed to preserve for appeal, for that is true in every case.  Rather, the import of the phrase "miscarriage of justice" is that there are circumstances unique to this case that demand our examination of an argument that has otherwise been waived.  Accordingly, we do not consider these arguments as properly before this court.

[7]Neither party has adequately briefed the potentially complex choice of law issues presented by the facts of this case.

Several states have a connection to the lawsuit: Southmark is a Georgia corporation; CHC is a Nevada corporation; Crescent Heights VI is a California corporation; Gran Chateau Realty VII is a Louisiana corporation; Southmark took possession of the note and related documents in its offices in Texas; and the Carriage House Apartments are located in Florida. Also, Southmark has asserted three different theories of recovery, and the law applicable to one may not govern the others. For example, the alleged equitable assignment of the note may be governed by the law of the state in which the transaction is claimed to have occurred, whereas Southmark's alter ego theory may be governed by the law of the state of Southmark's or CHC's incorporation.

At most, Southmark has briefed its issues with reference to some of the possible alternatives without attempting to resolve the choice of law problem itself. For instance, with respect to equitable assignment, Southmark applies Texas law because that is where Southmark took possession of the note; alternatively, Southmark applies Florida law because the note contains a choice of law clause that states that the laws of the forum in which the apartments are located shall "govern the note." With respect to the latter, such a clause may patently dictate that the language of the instrument is to be construed according to Florida law; however, it does not necessarily follow that activity outside of the four corners of the instrument, such as a transfer of the instrument, is also governed by Florida law. Southmark does not recognize this distinction and simply sets forth Texas and Florida law as equal alternatives. Further, when asked at oral argument which law applied to Southmark's alter ego theory, counsel for Southmark simply replied that Southmark applied both Texas and Nevada law in its brief.

The source of the fraudulent transfer actions asserted by Southmark is federal bankruptcy law, but state law controls whether Southmark has an interest in the note via equitable assignment or alter ego. "Where disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy." *Crist v. Crist (In re Crist)*, 632 F.2d 1226, 1229 (5th Cir. 1980) (citing 1A MOORE'S FEDERAL PRACTICE ¶ 0.325 (2d ed. 1979)), *cert. denied*, 451 U.S. 986, *and cert. denied*, 454 U.S. 819 (1981). Still, we have "recognized that there may be issues which should be resolved by application of the forum state's choice of law rules even where a federal court, in a federal question case, is free to do otherwise." *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148 n.16 (5th Cir. Unit B Sept. 1981) (citing *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 n.8 (5th Cir. Apr. 1981)). Here, however, neither party has advocated that we apply Texas's choice of law rules to determine which forum's law we will apply to our analysis of Southmark's arguments.

instrument are necessary to effect an equitable assignment." *In re Ashford*, 73 B.R. 37, 39 (Bankr. N.D. Tex. 1987). Rather, the requirements for an equitable assignment are: (1) evidence of the transferor's intent to assign; (2) consideration; (3) delivery; and (4) the transferor's complete surrender of control over the funds or property assigned. *Id.* at 39-40; *see also Pape Equip. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 402 (Tex. App. -- Houston [14th Dist.] 1987, writ ref'd n.r.e.). "To make an equitable assignment, an equitably constructive appropriation of the subject matter should be made so as to confer a complete and present right in the party for whose benefit the assignment is meant, even where the circumstances do not admit of its immediate exercise." *Pape Equip. Co.*, 737 S.W.2d at 402.

Here, there is simply no summary judgment evidence of a transaction by which CHC assigned or otherwise transferred the note to Southmark. In particular, there is no evidence of CHC's intent to assign the note, which is a critical element of an equitable assignment. Of the affidavits submitted by Southmark, only one was by an officer or director of CHC -- Robert M. Galecke, who was CHC's Treasurer from May 1988 to May 1991.

---

Given our discretion in this regard, we choose to apply Texas law where state law supplies the rule of decision. Our choice of Texas law is motivated by several factors. First, neither party has objected to the application of Texas law or argued that the application of Texas law will produce a result different from that which would obtain under the laws of another state. Further, the majority of the parties' arguments are grounded in Texas law. Indeed, Southmark's § 544 claim is based on a Texas statute. Finally, the crux of this appeal is whether Southmark had an interest in the note, which Southmark claims to have taken possession of and held in its offices in Texas.

Galecke makes no statement regarding CHC's intent with respect to the note. Otherwise, the record reveals no other evidence of CHC's intent to assign. Accordingly, the district court correctly affirmed the summary judgment in this regard.

**B. Control**

Southmark next asserts that it had an interest in the note because it controlled the note at the time of the transfer. In support of this theory, Southmark cites our decisions in *Coral Petroleum, Inc. v. Banque-Paribas London*, 797 F.2d 1351 (5th Cir. 1986), *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138 (5th Cir. 1993), and *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir. 1995), as well as authority from other courts. According to Southmark, these cases establish that control of property is sufficient to create an interest in that property for the purpose of bringing avoidance actions, notwithstanding the lack of legal ownership.

While it is true that the debtor's control of property may be such that the property is properly considered part of the debtor's estate in bankruptcy, our decisions make it clear that such control must be unfettered and without restriction. For example, in *Coral Petroleum* we affirmed the dismissal of an avoidance action because, although the funds in question had been placed in the debtor's general account, their use was restricted to repayment of a loan. 797 F.2d at 1359. In *Coutee*, another avoidance action, we held that a law firm was not the "initial

11

transferee" of funds deposited in its trust account because it held the funds only in a fiduciary capacity and "had no legal right to put the funds to its own use." 984 F.2d at 141. Finally, in *Grosz* we reversed the dismissal of a preference claim because the payment that the debtor sought to avoid "was drawn on [the debtor's] Payroll Account, a general bank account containing commingled funds, to which [the debtor] held complete legal title, all indicia of ownership, and unfettered discretion to pay creditor's of its own choosing." 49 F.3d at 1116. Further, in *Grosz* there was "no evidence of any agreement . . . restricting [the debtor's] access to or use of the funds." *Id.* at 1114.

In this case, however, Southmark's control of the note was not unfettered. As the district court noted:

> [T]he testimony in the bankruptcy [c]ourt was that CHC and not Southmark released the mortgage. This testimony and evidence that CHC was eventually formally merged with Southmark shows that Southmark was not free to utilize the [n]ote without regard to CHC's existence and ownership of the [n]ote.

CHC's necessary participation in the disposition of the note demonstrates that Southmark did not possess the unrestricted control that we have required to establish an interest in property in avoidance actions. Further, CHC's status as a wholly-owned subsidiary of Southmark does not vest ultimate control of the note in Southmark for these purposes. As we noted in *Coutee*:

> Dominion or control means legal dominion or control. Thus, the fact that the firm could have violated its fiduciary obligation to the [debtors] by taking the money out of the trust account and spending it as it pleased would make no difference in the analysis.

12

984 F.2d at 141 n.4 (citations omitted). Similarly, the fact that Southmark could have disregarded CHC's corporate form in disposing of the note does not establish that it had legal control of the note. The district court properly affirmed the summary judgment on this point.

## C. Alter Ego

Finally, Southmark urges that CHC was its alter ego, such that Southmark and CHC should be treated as one entity. Presumably, this entity would own both the fraudulent transfer action asserted by Southmark as the debtor in this case and the note made payable to CHC. This entity would then have the requisite interest in the note to allow it to bring the fraudulent transfer action against Crescent.

Under Texas law, "alter ego" is one of three distinct theories under which a litigant may attempt to "pierce the corporate veil." *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1286-89 (5th Cir. 1988) (describing three theories as "alter ego," "illegal purpose," and "sham to perpetrate a fraud"), *cert. denied*, 490 U.S. 1091 (1989). The "traditional goal" of piercing the corporate veil is to hold a corporation's shareholders, officers, and directors individually liable for the corporation's obligations, including reaching the assets of those individuals to satisfy the corporation's liabilities. *See Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.

13

1986), *superseded on other grounds by* Tex. Bus. Corp. Act Ann. art. 2.21 (West Supp. 1996)). While such efforts are usually mounted by creditors of a corporation, we have concluded that Texas law would even permit a corporation seeking "to meet its corporate obligations" to pierce its own corporate veil to "hold accountable those who have misused the corporation." *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition)*, 817 F.2d 1142, 1152 (5th Cir. 1987).

In the instant case, Southmark is not attempting to pierce CHC's corporate veil to hold itself accountable for CHC's obligations or to reach its own assets to satisfy CHC's liabilities. Also, Southmark is not trying to pierce its own corporate veil to reach its shareholders, officers, and directors. Rather, Southmark seeks to apply what we have described as "reverse piercing" of the corporate veil. *Zahra Spiritual Trust*, 910 F.2d at 243-44.

Typically, the goal of such reverse piercing is to reach the assets of the *corporation* to satisfy the liabilities of its *individual* shareholders, officers, and directors. *See, e.g., id.* (government sought to use reverse piercing to assess tax lien on corporate assets on account of alleged corporate owners' individual tax liabilities); *Zisblatt v. Zisblatt*, 693 S.W.2d 944 (Tex. App. -- Fort Worth 1985, writ dism'd) (wife sought to use reverse piercing in divorce proceeding to bring assets of husband's wholly owned corporation into community estate); *Dillingham v. Dillingham*, 434 S.W.2d 459 (Tex. App. -- Fort Worth

14

1968, writ dism'd) (same); *American Petroleum Exch., Inc. v. Lord*, 399 S.W.2d 213 (Tex. App. -- Fort Worth 1966, writ ref. n.r.e.) (judgment creditor of majority shareholder in corporation sought to use reverse piercing to proceed against corporation's assets to enforce judgment).  A further distinction is that, while one may attempt an ordinary piercing of the corporate veil under any of three theories, *supra*, Texas law apparently permits a reverse piercing only under the alter ego theory.  *Zahra Spiritual Trust*, 910 F.2d at 244.  We have summarized the application of the alter ego theory under Texas law as follows:

> Based upon equitable concerns, an alter ego remedy applies when there is such an identity or unity between a corporation and an individual or another entity such that all separateness between the parties has ceased and a failure to disregard the corporate form would be unfair or unjust.

*S.I. Acquisition*, 817 F.2d at 1152 (citing *Castleberry*, 721 S.W.2d at 272)).

In this case, Southmark seeks to use reverse piercing to bring one of CHC's assets -- the note -- into its estate so that it may assert a fraudulent transfer action against Crescent based on a transaction involving the note.  This particular use of reverse piercing, however, is distinguishable in at least one critical respect from the Texas cases that have recognized the reverse piercing remedy.  In those cases, cited *supra*, it was a *third party* that sought to employ reverse piercing to avoid the inequity of allowing an adverse party to abuse the corporate form by secreting its assets in a separate entity.  In Southmark's case, the party seeking to disregard the corporate form is the

15

very party that abused that form in the first place.  Applying this equitable remedy under these circumstances would seem to disserve its purpose, which is "to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice."  *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 575 (Tex. 1975).

Further, although we held in *S.I. Acquisition* that a corporation may pierce its own corporate veil, it does *not* follow by analogy that a shareholder may employ reverse piercing to reach assets owned by its corporation.  When a corporation pierces its own corporate veil, the corporation is not the party with unclean hands; rather, the corporation is seeking to "hold accountable those who have misused the corporation" -- i.e., the shareholders, officers, or directors.  *S.I. Acquisition*, 817 F.2d at 1152.  What Southmark proposes is to allow the party who abused the corporate form to employ an equitable remedy to disregard that form for its own benefit.

We do not hold that a shareholder could never use the reverse piercing doctrine under any circumstances.  Rather, we simply note that the distinction between Southmark's proposed use of reverse piercing and its use in those few Texas cases that have recognized this remedy is such that there is currently no authority under Texas law for the application urged by Southmark.  Accordingly, the district court correctly affirmed the summary judgment with respect to Southmark's alter ego theory.

**IV.  CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's affirmance of the judgment of the bankruptcy court.